Filed 1/6/25  In re A.L. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re A.L., a Person Coming Under the Juvenile Court Law. | |
| | D084095 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ15940) |
| v. | |
| J.H., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Nadia J. Keilani, Judge.  Affirmed.

Michelle D. Pena, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Kristen M. Ojeil, Deputy County Counsel, for Plaintiff and Respondent.

J.H. (Mother) appeals a placement order following a contested six-month review hearing (Welf. & Inst. Code, § 366.21[1]), which denied her request to return A.L. (Minor) to Mother's home. Mother contends the trial court lacked substantial evidence to support its finding that it would be detrimental to return Minor to Mother's home. She asks this court to reverse the order with directions to return Minor to Mother's home under the supervision of the San Diego County Health and Human Services Agency (Agency). The Agency contends substantial evidence supports the detriment finding based on Mother's lack of insight into the issues that led to detention and her delayed participation in services, including a child abuse course. We agree with the Agency and affirm the order.

## BACKGROUND

A.    *Family History*

Minor was taken into protective custody in another state after Mother was arrested in 2018 for criminal conversion and resisting arrest at a shopping mall.[2] Minor was out of Mother's care for over two years.[3]

In October 2021, a couple of months after authorities returned Minor to Mother's home on a trial visit, child services investigated another allegation of abuse based on a report that Mother cut Minor's lip when she hit Minor with a belt. The child services agency could not substantiate the allegations

---

[1]    Further undesignated statutory references are to the Welfare and Institutions Code.

[2]    Conversion, as described by statute in the other state, appears to be equivalent to theft in California. The statutory definition of resisting arrest in the other state is also similar to the California definition.

[3]    Mother attributes much of this time to COVID-related court slowdowns in Indiana.

2

by a preponderance of evidence, but noted Minor's safety was being monitored through the reunification case. The out-of-state case terminated in May 2022 after Mother and Minor relocated to another state.

B.    *Initiation of California Dependency Matter*

Mother and Minor moved to California in early 2023. In June 2023, the Agency received two referrals on the same day. When Mother was called to pick up Minor from an after-school program due to a behavioral problem, Mother said in Minor's presence, "I don't know if I want her. I'm going to put my foot up her ass." Mother made Minor stand on one foot to apologize for the behavior. The reporting party said Minor appeared fearful of Mother. Minor previously said she was afraid Mother would give her a "whooping."

A second party reported that Mother constantly screamed and yelled profanities at Minor. When neighbors complained, Mother became aggressive and yelled, "It's my fucking daughter." The second reporting party was concerned that Mother was emotionally abusing Minor and had concerns about Mother's mental health.

About a week later, Mother pinched Minor's arm when Mother learned Minor had misbehaved at an after-school program. The pinch left a visible welt and torn skin. Minor ran back to the after-school center saying she had to go to the bathroom because she soiled her clothing. Minor reported the incident to a staff member. She further reported that Mother physically abused her, including hitting her with a belt buckle and choking her. Minor had visible marks on her upper chest. Local police responded, arrested Mother, and took Minor into protective custody. Minor was detained at Polinsky Children's Center (PCC), an emergency shelter for children.

Mother acknowledged she disciplined Minor by whipping her with a belt. Minor has a scar from a belt buckle, which Mother said occurred

3

because a belt broke while Mother hit Minor with it. Mother did not believe using a belt or pinching Minor was child abuse because this is how Mother was disciplined when she was young. Mother said Minor got into trouble at the after-school program because Minor hit, screamed at, spat on, and kicked people there. Mother acknowledged yelling at Minor because of Minor's behaviors, which Mother found embarrassing.

Maternal grandfather said Mother was removed from her own mother's care due to abuse. Minor's maternal great-grandmother (Mother's grandmother) primarily raised Mother. Maternal grandfather suggested that maternal great-grandmother should also care for Minor.

Maternal great-grandmother was not surprised Minor was removed from Mother's care again. Maternal great-grandmother said Mother had mental health "episodes" and was diagnosed with a mental health condition. She said Mother did not take recommended medications.

The Agency filed a petition on July 6, 2023 alleging Minor was a child who required the protection of the court under section 300, subdivision (a) because she was subjected to serious nonaccidental physical harm due to Mother's excessive discipline, which included pinching and hitting Minor with a belt that left marks and scarring on Minor's body. Minor was placed in the home of a nonrelative extended family member.

At the detention hearing, the court found the Agency made a prima facie showing on the petition and ordered Minor's continued detention out of Mother's home. The court instructed the Agency to initiate interstate compact proceedings to evaluate the maternal great-grandmother for possible placement and to evaluate a possible local nonrelative extended family member. The court also ordered voluntary services for Mother and liberal visitation with Minor.

4

C. *Jurisdiction and Disposition Phase*

Minor told the social worker that Mother pinched her "all the time" and the pinches leave marks and bruises. She also said Mother "whoops" her "on the butt" and her "private part" with a belt using the "solid part, meaning the most hurting part." She pointed to a scar on her shoulder. Minor reported that Mother called her names, said she hated Minor, said she thought Minor was ugly, and she wanted Minor to die. This made Minor feel like she wanted to die. Minor did not feel safe near Mother. Minor acknowledged having incontinence episodes in her clothing.

The court placed Minor with temporary caregivers. Minor disclosed to these caregivers that Mother administered numerous beatings with a belt buckle and Mother once broke a locked door to inflict punishment on Minor. Minor also disclosed an incident when Mother strangled Minor, held her against a wall, and punched her in the face for trying to get away. In one instance, after Minor hit the caregivers' child, Minor cowered and shook in the corner when the caregiver told Minor she was not allowed to hit their child. After caregivers explained the no-hitting boundary, Minor asked the caregivers if they hated her.

Mother told the Agency she did not believe hitting Minor with a belt or pinching was physical abuse. She said this was how she was disciplined and it was passed down to her from her culture. Mother told the caregiver that she came from "a strong discipline background" and she disciplined Minor so that she knew how to behave.

A child abuse evaluator said Minor's reports that Mother hit her with a belt could account for the patterned lesion on Minor's chest. It was also a plausible explanation for several other linear hyper-pigmented lesions on Minor's abdomen, back, and right arm. These injuries were consistent with

physical abuse. Although corporal punishment is used as a form of discipline, the evaluator stated it is never appropriate to strike a child with an object. The evaluator noted the bystander reports that Mother would make statements in Minor's presence saying Minor was a product of rape, that Mother did not want her, or that she wished Minor would die. The evaluator believed these statements were consistent with psychological maltreatment and emotional abuse in the form of spurning and terrorizing, which can lead to short and long-term effects on a child's health. The evaluator believed Minor's incontinence issues could be a trauma symptom.

During a child and family team meeting in July 2023, Mother became verbally aggressive and told Minor to "keep her mouth shut." She escalated to the point that Minor started to cry and Mother had to be removed from the meeting due to continued traumatization of Minor.

The initial case plan stated a safety goal for Mother to develop a strategy to show positive disciplinary methods that do not involve physical or emotional harm. The Agency would need to see Mother use this new discipline approach for at least six months. Mother's plan included a parenting education program, a 52-week child abuse treatment program, and conjoint therapy with Minor when appropriate.

Mother was given paperwork to enroll in a 52-week child abuse group class in early August 2023. However, Mother said she had "a problem" with how many classes she needed to attend and thought the length of the program was too long. She wanted to wait to see if the court ordered her to participate.

In mid-August, Minor's behaviors regressed. Minor defecated on herself at the after-school program. She showed other children and staff

members and smeared feces around the room. Minor was not allowed to return to the after-school program after this incident.

Minor began individual therapy, but did not initially engage with the therapist. Minor's caregiver believed Minor had attention deficit hyperactivity disorder (ADHD) and needed an individual education plan. The caregivers expressed concerns about Minor's behaviors and stated they could not keep Minor in their home for long term care. Minor returned to PCC in September 2023.

D.   *Contested Adjudication and Disposition Hearing*

At the contested adjudication hearing in October 2023, the court sustained the petition finding by a preponderance of the evidence that Minor was a person described by section 300, subdivision (a). The court commented that Mother admitted using physical discipline which left documented bruises and scars on Minor, perhaps emotional scars as well.

At the disposition hearing the following day, Minor's counsel stated Minor wished to live with Mother on the condition that Mother does not spank her. Minor's counsel, as guardian ad litem, agreed with the Agency's recommendation saying Mother needed to make some progress in her case plan and engage in services to make sure corporal punishment does not occur in the future.

The court found by clear and convincing evidence that removal from Mother's care was appropriate. The court found there was a substantial danger to Minor's physical health, safety, protection, and emotional well being if she returned to Mother's care. The court referred to numerous descriptions of severe corporal punishment Minor suffered at the hands of Mother which left Minor with lifelong scars and serious bruising. The court

7

also noted that Minor had exhibited fear of Mother and sounded "terrified" when they discussed placing her in Mother's care.

Mother asked to strike the child abuse class from the case plan and objected to a psychological evaluation. The court rejected Mother's argument that a child abuse class was not necessary, saying such a class "is probably the most pivotal art of her case plan given the allegations that the [c]ourt has already found to be true." The court determined that psychological evaluations of both Mother and Minor were appropriate given concerning behaviors exhibited by each of them.

E.    *Six-month Review Period*

Minor's psychological evaluation was completed in December 2023 and included a diagnosis of ADHD with hyperactive, impulsive, and disruptive behavior. The evaluator thought Minor's bowel and urinary incontinence may be related to difficulties coping with her living situation and a combination of both challenges recognizing bodily cues that she needed to use a restroom along with problems regulating her emotions. Based on the records and Minor's reports, the evaluator also diagnosed probable posttraumatic stress disorder. The evaluator recommended that Minor needed consistent engagement in services for six to nine months to determine her progress as well as whether Minor continues to face "new stressors."

Mother's psychological evaluation was completed in January 2024. The evaluator found Mother met the criteria for delusional disorder as well as a personality disorder not otherwise specified with primary features of paranoid personality and borderline personality disorders. Mother exhibited "fixed beliefs of a persecutory nature" which were "primarily related to racial injustice and bias." She had limited coping, communication, and conflict resolution skills. Her ability to regulate her emotions and anger were

8

impaired as were her insight and judgment. Mother's defensive presentation made it difficult to assess her true psychological functioning. She was unable or unwilling to acknowledge her role and responsibility in the removal of Minor. Mother lacked insight about Minor's emotional needs and appeared unwilling or unable to place Minor's needs ahead of her own.

The evaluator discussed the case with a cultural consultant to ensure cultural sensitivity in the evaluation. The consultant confirmed that "church pinches and whoopings are a real thing" in the state where Mother was raised, but the consultant also said, "They are not the seed of abuse or not wanting to engage." The consultant expressed concern about Mother's expressed belief that Minor was conceived from a sexual assault. The consultant stated this perception could lead to harsher words and to harsher discipline of Minor because "empathy and attachment are not present." Based on the consultation, the evaluator determined Mother's behaviors appeared "primarily related to mental health issues and real or perceived traumas" rather than "cultural influences."

The evaluator recommended an intense outpatient program, medication evaluation, and individual therapy with a therapist trained in personality disorders who matches Mother's cultural and ethnic background. The evaluator also recommended continued participation in child abuse prevention classes "to gain increased awareness and knowledge of the symptomology of abuse, effects of abuse/neglect on children, and develop skills to decrease potential for abuse in the future."

In January 2024, Minor moved from PCC to a temporary placement which she liked. However, Minor exhibited concerning behaviors such as locking the caregivers out of their house and not getting along with other children in the home and the neighborhood. The caregivers were willing to

keep Minor through the school year, but said they were not a permanent placement option.

Maternal great-grandmother was approved for placement out of state. The Agency recommended moving Minor to great-grandmother's care. The court continued the matter to address Minor's medications and to explore other placement options.

In February, the Agency set a special hearing to request placement of Minor with maternal great-grandmother out of state. Mother did not agree and requested a trial. Minor's counsel agreed with the Agency's recommendation, but requested to wait to move Minor until the end of the school year so Minor could finish some of her programs. The caregivers were willing to keep Minor until then. Minor wanted to move out of state, but wanted Mother to come with her.

At the scheduled six-month review hearing in April 2024, the Agency continued to recommend placement out of the home with maternal great-grandmother in the other state. Mother objected and requested a trial. At this point, Minor expressed a desire to stay in California near Mother. The guardian ad litem submitted on the Agency's recommendation to move Minor to maternal grandmother's care after the school year.

F.    *Contested Six-month Review Hearing*

After several continuances, the contested review hearing occurred on May 13, 2024.

Minor testified that she liked visiting with Mother and being able to hug and cuddle with her. Minor was happy that Mother attended a singing performance in which Minor participated because Mother taught Minor to sing. Minor wanted to stay in California to be near Mother and to continue

10

at the school Minor attended. Minor felt safe living with Mother because visits were improving and Mother did not yell at her during visits.

Minor did not want to return to PCC because she got into fights with other kids. She would feel safer going to her great-grandmother than returning to PCC. She would feel comfortable going to her great-grandmother at the end of the school year.

The social worker testified that the Agency would facilitate weekly in-person visits with Mother if the child moved out of state, including paying for flight and hotel expenses. Mother could visit with Minor more frequently by, for example, visiting several times over a weekend.

As recently as March 2024, phone visits upset Minor and caused her to dysregulate. Mother began participating in a parenting education class in March 2024 and was receptive to its subject matter. Mother began taking the child abuse classes at the end of April 2024, after the social worker had a frank discussion with Mother about the need to take part in the classes.

If Minor were not placed out of state and the Agency could not locate a resource home after the school year, Minor would return to PCC.

Mother testified on her own behalf. She asked the court to place Minor with her. Mother did not agree with placing Minor out of state with the maternal great-grandmother because Mother does not have a good relationship with the maternal great-grandmother.

Mother explained she completed the psychological evaluation. She began attending the parenting class in March 2024. As of the hearing, she attended three child abuse classes. Mother said she learned that she is "a good mom," "a good person," and she "is doing a great job." She learned about different parenting styles from different cultures and parenting techniques.

She would not mind continuing to attend the child abuse class if Minor was returned home.

When asked on cross-examination whether she had pinched or hit Minor with a belt, Mother responded, "We've all been disciplined before." She denied using a belt buckle or scarring Minor. She denied physically abusing Minor or using physical force.

Mother did not participate in child abuse classes at the beginning of the case because she had a lot going on. She also said, "I had every right to go against it and ask for a fair trial." She started the 52-week child abuse course a few weeks before the contested hearing. But she said she was told that it "does not have to be completed" before Minor could return home.

After considering the evidence presented and arguments of the parties, the court found the return of Minor to Mother's care would create a substantial risk of detriment to Minor's safety, protection, and emotional well-being.

The court found it was not in Minor's best interest to place her out of state. The court ordered the Agency to continue efforts in earnest to find a placement for Minor in San Diego and to minimize the need to return her to PCC. Mother appealed.

DISCUSSION

Mother contends there was insufficient evidence for the court's finding that it would be detrimental for Minor to return to Mother's care at the contested six-month review hearing. We disagree.

I.  *General Legal Principles*

After the juvenile court finds jurisdiction under section 300, it may remove a child from a parent pursuant to section 361 at a dispositional hearing only if it finds by clear and convincing evidence "[t]here is or would

12

be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parents." (§ 361, subd. (c)(1); see *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248 (*Cynthia D.*) ["At the dispositional hearing, the standard of proof for removal from a custodial parent is clear and convincing evidence."].)

At the six-month review hearing, in contrast, there is a statutory presumption that the child will be returned to parental custody "unless the court finds, by a *preponderance of the evidence*, that the return of the child to their parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e)(1).) (Italics added.) The Agency bears the burden of establishing that detriment. (*Ibid*; *Cynthia D., supra*, 5 Cal.4th at pp. 248–249.) Proof by a preponderance standard at this stage sufficiently protects a parent's due process rights. (*Cynthia D.*, at pp. 253–256.)

"In evaluating detriment, the juvenile court must consider the extent to which the parent participated in reunification services" and "efforts or progress the parent has made toward eliminating the conditions that led to the child's out-of-home placement." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400 (*Yvonne W.*).) The juvenile court "shall consider the efforts or progress, or both, demonstrated by the parent . . . and the extent to which they availed themselves of services provided . . . ." (§ 366.21, subd. (e)(1).)

A juvenile court may find it is detrimental to return the child to the parent even if the parent has complied with the reunification case plan. (See *Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 704–711 (*Constance K.*) [reports by mental health and medical professionals and social

13

worker supported a finding that returning the minors to mother would be substantially detrimental even though mother had completed her program]; *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1143 [a court may consider compliance with reunification plan requirements, but the court "must also consider the parents' progress and their capacity to meet the objectives of the plan"]; *In re Jonathan R.* (1989) 211 Cal.App.3d 1214, 1221.) ["a finding that improvements in [a] parent[']s circumstances outweigh the failures during reunification does not guarantee return of the child to the parents"].) The juvenile court may consider the parent's past conduct as well as present circumstances (*In re Troy D.* (1989) 215 Cal.App.3d 889, 900), and the court is permitted to consider a parent's denial of the protective issues when evaluating detriment in returning a child to parental custody (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 865–868 (*Georgeanne G.*)). "It is for the [juvenile] court to weigh [evidence of present circumstances] against the evidence of the parents' efforts, accomplishments, and failures during the reunification period." (*In re Jonathan R.*, at p. 1221.)

"We review the juvenile court's finding of detriment for substantial evidence. [Citations.] Under that standard we inquire whether the evidence, contradicted or uncontradicted, supports the court's determination." (*Georgeanne G., supra*, 53 Cal.App.5th at pp. 864–865; see *In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483 (*Mary B.*).) " ' "[W]e draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] ' "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient

14

facts to support the findings of the trial court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

II. *Substantial Evidence Supported the Detriment Finding*

To support her primary contention that substantial evidence does not support the trial court's detriment finding, Mother relies upon *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1326 where the appellate court determined substantial evidence did not support a finding that returning children to their mother would create a substantial risk of detriment. In that case, the children were removed after a single instance when she left her children alone to go to work. After removal, the mother substantially complied with the reunification plan, learned proper parenting skills, and accepted responsibility for the circumstances that brought her children into the juvenile court's custody. There was no evidence of physical or emotional abuse and there was no evidence the mother had a mental illness that affected her parenting skills. (*Ibid.*) The instant matter presents a different situation.

The juvenile court here found by a preponderance of the evidence that returning Minor to Mother's care would create a substantial risk of detriment to Minor's safety, protection, and emotional well-being.

As the court explained, Minor was removed because the court found Mother's forms of discipline constituted child abuse based on both physical evidence and statements of Minor. The court expressed concern that Mother had not made more progress with the child abuse class in the initial review period. The court explained this was "arguably the most important component" of Mother's case plan because the class is "tailored to address what is or is not child abuse and how to prevent child abuse." The court was concerned both with Mother's delay in starting the class for 10 months and

15

with the fact that Mother did not acknowledge or accept that her conduct resulted in this dependency matter. The court believed greater participation in the child abuse class would likely "go hand in hand with that acceptance and with that knowledge." The court's findings are supported by substantial evidence.

At the contested hearing, Mother denied she physically abused Minor. When asked specifically about pinching or hitting Minor with a belt, Mother responded, "We've all been disciplined before." She also denied hitting Minor with a belt buckle and leaving a visible scar.

When she was offered child abuse classes in July 2023, Mother said she had "a lot going on" and had "every right to go against it and ask for a fair trial." However, the court rejected Mother's request to strike the child abuse class from her plan at the contested adjudication and disposition hearing in October 2023. At that time, the court explained the class was "the most pivotal part of her case plan" given the true finding on the allegations of child abuse based on excessive discipline.

The psychologist who evaluated Mother also recommended, among other things, participation in child abuse prevention classes "to gain increased awareness and knowledge of the symptomology of abuse, effects of abuse/neglect on children, and develop skills to decrease potential for abuse in the future." She recommended parent education and coaching to meet the emotional needs of Minor, foster positive attachments, and increase Mother's "mediation and communication skills." The psychologist believed measurable progress could be made in six to 12 months of treatment if mother was engaged in a "highly motivated manner." The psychologist, however, thought Mother's lack of motivation to engage in services, pervasive mistrust, and impaired insight and judgment made her prognosis poor.

16

Yet, Mother did not begin the child abuse class. She did not respond to monthly requests and encouragement by the social worker to engage in the child abuse class. She only agreed to the class in late March 2024 when the social worker had a candid conversation about the importance of the class to the progression of the case. She completed only three classes by the time of the contested hearing in May 2024. At that point, it was too early to determine if she had made progress.

Mother testified she learned from the child abuse sessions only that there are different parenting styles and that she was a good mother doing a "great job." She did not believe she needed to complete the course to have Minor returned to her care.

The court was required to consider the extent to which Mother availed herself of the services offered to her as well as her efforts and progress in those services. (§ 366.21, subd. (e)(1); *Mary B., supra*, 218 Cal.App.4th at pp. 1483–1484.) In reviewing whether the record contains substantial evidence that returning a minor to a parent's custody would be detrimental, "we must keep in mind that the purpose of the reunification plan is 'to overcome the problem that led to removal in the first place.' " (*Id.* at p. 1483; *Yvonne W., supra*, 165 Cal.App.4th at p. 1400.) Mother's lack of insight about how her disciplinary conduct brought Minor into the court's care along with Mother's delayed participation and minimal progress in parenting and child abuse prevention services amply supported the court's finding that it would be detrimental to return Minor to Mother's care.

Mother's contention that her recent positive visits "proved" Minor would be safe if returned to Mother's care under supervision is speculative. Although Mother participated in supervised visits and in supervised phone visits, they did not yet establish a pattern of safe behavior with Minor. Minor

17

was initially hesitant to visit Mother in person and expressed discomfort with Mother doing her hair during visits. There was a lapse in visits when Minor was placed at PCC and Minor expressed disappointment that Mother failed to see Minor then. Weekly supervised visits resumed in January 2024 when Minor was placed in a foster home.

Minor often became dysregulated and wet the bed after phone calls when Mother would yell at Minor or criticize her. In February, as a response, the caregiver set time limits on phone calls. This improved Minor's mood and bed wetting incidents. However, even at the end of March 2024, Minor's teacher reported that Mother's visits and phone calls still had a negative impact on Minor, leaving her in emotional turmoil each week. Minor said she liked her visits with Mother, except when Mother yelled at her.

In May 20024, a social worker observed a positive visit where Mother and Minor played games and read books together. Mother's parenting education facilitator was present during the visit and Mother was working on the parent-child interaction module. Minor testified that she enjoyed visiting and cuddling with Mother. At the time of trial, she felt she could be safe with Mother because visits were "improving" and Mother had not yelled at her "at all."

The fact that Mother recently engaged in the parenting and child abuse classes and had positive supervised visits shortly before the contested hearing with Minor was encouraging. But, given the history of trauma Minor experienced from Mother's physical and verbal abuse, it was reasonable for the court to want to see more progress with these courses and increased visitation before returning Minor to Mother's care.

Mother's contention on appeal that it would have been safe to return Minor to her care because "there was no evidence that Mother would not

18

follow through with court orders to refrain from using physical discipline" and because Minor "was known to report her concerns about Mother's discipline and yelling in the past" is hopeful speculation at this stage of the case. We cannot interfere with the juvenile court's order based on speculation (*In re Jose C.* (2010) 188 Cal.App.4th 147, 159) or on the hope that Mother will comply with court orders or Agency supervision (*In re John M.* (2012) 212 Cal.App.4th 1117, 1127).

Mother does not have a proven track record of complying with court orders, having only recently availed herself of services ordered at the beginning of the case. And relying on Minor to report safety concerns would place an unfair and undue burden on her to maintain her own safety. Minor previously explained she could not stand up for herself because Mother would hit her. She only felt safe because she was out of Mother's care. The record establishes that Mother's continued participation in her case plan is essential before she can realize the goal of returning Minor to her care.

Finally, Mother has not established a violation of her due process rights by the court's placement decision. " 'Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect.' " (*Constance K., supra*, 61 Cal.App.4th at p. 703.) " 'The dependency scheme, when viewed as a whole, provides the parent due process and fundamental fairness while also accommodating the child's right to stability and permanency.' " (*Id.* at p. 704.)

The court here considered the best interests of Minor in making the placement decision. The court rejected the Agency's recommendation to place Minor with the maternal grandmother in another state because it determined

such placement would not be in Minor's best interest and would impede reunification. The court was aware that changing placements was not ideal for Minor, but acknowledged they were "in a bind" because Minor's current placement could not continue. The court, therefore, emphasized the need for the Agency to continue its efforts "in earnest" to find a suitable placement with a new foster family by the end of the school year so Minor could transition immediately to that home rather than return to PCC. The court was concerned about reports that Minor experienced harm from her interactions with other children at PCC, but stated that was not reason to send a child out of state. The court explained that both PCC and the Agency had a duty to ensure Minor's safety if it became necessary to place her there. As discussed, substantial evidence supported the juvenile court's finding that the Agency met its burden of showing it would be detrimental to return Minor to Mother's care. We cannot conclude the court abused its discretion or failed to consider the best interests of Minor in making the placement decision.

DISPOSITION

The order is affirmed.

RUBIN, J.

WE CONCUR:

O'ROURKE, Acting P. J.

IRION, J.

20